[No. B227518. Second Dist., Div. Four. Dec. 22, 2011.]

JAMES J. LITTLE, Plaintiff and Respondent, v.
AMBER HOTEL COMPANY, Defendant and Appellant.

282

**COUNSEL**

Law Offices of Baird Brown, Baird A. Brown; Greines, Martin, Stein & Richland and Marc J. Poster for Defendant and Appellant.

J.J. Little & Associates, James J. Little and David Schultz for Plaintiff and Respondent.

**OPINION**

**MANELLA, J.**—Respondent James J. Little asserted claims against appellant Amber Hotel Company (Amber) for tortious interference with contract,

alleging that Amber impaired Little's lien on an attorney fee award. Amber challenges the judgment in Little's favor, contending that Little's former client nullified the fee award through a settlement, and that the damages awarded to Little fail as a matter of law. We discern no reversible error and affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. *Prior Action*

In August 2004, Amber initiated a lawsuit against Frank Martini and his brother, Satanand Sharma, together with several businesses they controlled (collectively, the Martini parties).[1] In the action, Amber asserted claims for breach of contract and fraud, alleging that the Martini parties failed to pay a broker's commission owed to Amber in connection with the sale of a hotel. The claims were based in part on a listing agreement and a sales agreement, each of which contained an attorney fee provision.

In October 2004, Martini and Sharma hired Attorney Little to provide representation in the action. They executed a contract entitled "Retainer Fee Agreement and Attorney's L[ie]n," which provided in pertinent part: "Client agrees to pay Attorney $275.00 per hour, $175.00 per hour of which will be deferred by Attorney to be held as [a] lien and collected in full against any attorney[] fee award made by the Court in favor of Client at the conclusion of this case. In this regard, Client specifically acknowledges, agrees, gives and assigns to Attorney an attorney's lien on any sum to which Client may become entitled to secure Attorney's compensation for said deferred fees. Given that there exists a risk that Client will not be successful in this case (such that there is the further risk that Client will not be entitled to any attorney[] fee award), Client agrees that in the event there is an attorney[] fee award in favor of Client, Attorney is entitled . . . to keep one hundred percent (100%) of any attorney[] fees awarded Client without deduction for the $100.00 discounted hourly rate to which Attorney is entitled . . . . Client agrees that if there is no recovery to which the above-referenced lien attaches Client remains responsible for the full amount of the deferred fees."

Following a trial, on December 3, 2007, judgment was entered in favor of the Martini parties and against Amber on Amber's claims. The judgment stated: "The court reserves jurisdiction to determine whether to award costs and to make an attorney fee award and, so, to determine the amount of that award." After the trial court denied Amber's new trial motion, Amber noticed an appeal from the judgment and postjudgment rulings on February 29, 2008.

---

[1] Although Frank Martini's name is Devanand Sharma, he does business under the name "Frank Martini," and the parties so refer to him. We do so as well.

While the appeal was pending, on March 24, 2008, the trial court awarded the Martini parties $152,700 in attorney fees and $8,669.52 in costs. On May 9, 2008, the court amended the December 2007 judgment to include the awards for attorney fees and costs. Amber filed no separate notice of appeal from these awards.

Following settlement negotiations between Amber and the Martini parties, on June 11, 2008, notices were filed acknowledging satisfaction of the December 2007 judgment, as modified by the March 2008 fee award order. The notices stated: "The judgment creditor has accepted payment or performance other than that specified in the judgment in full satisfaction of the judgment." On June 17, 2008, Amber abandoned its appeal.

## B. *Underlying Action*

### 1. *Complaint*

On May 18, 2009, Little initiated the underlying action against the Martini parties and Amber.[2] His complaint asserted claims for breach of contract and quantum meruit against the Martini parties, and claims for intentional interference with contract, constructive trust, and conversion against Amber. The complaint alleged the following facts: In mid-March 2008, after Little had secured the December 2007 judgment and applied for an award of attorney fees, he learned that the Martini parties and Amber were negotiating a settlement and informed them of his lien. Nonetheless, after the trial court issued the fee award, the Martini parties and Amber entered into a settlement under which Amber agreed to dismiss its appeal regarding the December 2007 judgment in exchange for Martini's abandonment of the fee award. To hide the settlement, neither the Martini parties nor Amber served Little with the acknowledgments of satisfaction of the judgment.

### 2. *Trial*

The jury trial on Little's claims occurred in June 2010.

#### a. *Little's Evidence*

Little testified as follows: At the time of trial, he had been practicing law for 28 years. Sharma was among his first clients. When Martini and Sharma sought to engage Little, he advised them to seek independent legal advice with respect to the lien provisions of the proposed retainer agreement.

---

[2] Also named as defendants were Julian A. Pollok and the Law Offices of Julian A. Pollok, who represented Amber in the prior action. These defendants were dismissed from the underlying action and have not appeared on appeal.

According to Little, he offered to defer a portion of his fees because Martini and Sharma had "cash-flow problems," and he hoped that a fee award would provide an alternative source of payment for his fees. On October 14, 2004, Martini and Sharma executed the retainer agreement.

After Amber noticed its appeal from the December 2007 judgment, Little decided not to represent the Martini parties during the appeal, as his retainer agreement did not require him to do so, and the Martini parties lacked the funds to pay him for continued representation. However, when Little tried to withdraw his representation regarding the appeal, the appellate court informed him that he remained counsel of record.

In March 2008, after Little requested a fee award on behalf of his clients, Martini told Little that Amber had proposed to settle the action for $75,000. Martini also said that he intended to give Little one-third of the settlement funds. Little reminded Martini that his fee agreement contained a lien provision, told Amber's counsel, Julian Pollok, that he had a lien against any fee award, and served formal notices of lien in the action. Later, Little learned that Martini was considering a settlement that encompassed the judgment and the Martini parties' potential malicious prosecution action against Amber, but was assured that Martini "was protecting and preserving" Little's attorney fees.

Little heard nothing more regarding settlement until June 2008, when the trial court sent him copies of the Martini parties' acknowledgments of satisfaction of judgment, prepared by Pollok, and a copy of Amber's dismissal of the appeal. No party served these notices upon Little, even though he was a counsel of record in the trial action and on appeal.

Little testified that as a result of the settlement, he was unable to recover $190,684.06 in fees owed under the retainer agreement, comprising the $152,700 fee award and approximately $37,984 in other unpaid fees. According to Little, Amber's settlement with the Martini parties denied him the benefit of the fee award and prompted them not to pay his outstanding deferred fees. Little further stated that he sought to recover the $190,684.06 in unpaid fees solely from Amber because the Martini parties would not have breached the retainer agreement "but for the false representations made to them" by Amber.

Little also testified that he had incurred additional damages due to the loss of what he termed "the Sharma account." Although he remained "amicable" with Martini and Sharma, they no longer employed him. Prior to the settlement, they had paid him an average of $150,000 per year for at least eight years, resulting in annual net profits of $82,000. In view of his age, he

expected his relationship with Martini and Sharma to have continued for 12 years, resulting in lost future profits totaling $984,000.

Martini also testified on Little's behalf.[3] According to Martini, prior to the action involving Amber, he employed Little to provide legal services for 10 or 11 years at an annual rate of approximately $150,000. In hiring Little to provide representation against Amber, Martini and his brother executed the October 2004 retainer agreement with the intention of "transfer[ring] owner-ship" of any fee award to Little. During the action involving Amber, Little advised Martini that he had a potential claim for malicious prosecution against Amber.

In early 2008, Martini was contacted by Stephen Post, Amber's president. Post offered to pay the Martini parties a sum of money and dismiss Amber's appeal in exchange for a "dismissal" of the December 2007 judgment and abandonment of any potential malicious prosecution action. As the litigation involving Amber threatened high litigation expenses, Martini explored a settlement with Amber. During the negotiations, Pollok maintained that the December 2007 judgment was certain to be reversed on appeal, and that Martini would ultimately be subject to a judgment for damages exceeding $1 million. When Martini informed Little that Post had offered $75,000 to settle the litigation, Little reminded him of the attorney lien and noted that the fee award Little sought was likely to exceed the offer. According to Martini, in negotiating the settlement, he repeatedly raised the issue of Little's lien, and never intended to release it.

At some point, Martini entered into an oral settlement agreement with Post. Under its terms, Amber was to dismiss its appeal and give Martini $100,000 "in a quiet way," that is, the payment was not be disclosed to anyone, including Little. In exchange, Martini agreed not to pursue a malicious prosecution action against Amber. According to Martini, Post and Pollok told him that the settlement agreement did not concern the attorney fee award; in addition, Post promised that Amber "would take care of" Little's claim to the fee award. As a result of these assurances, Martini and the other Martini parties executed the acknowledgments of satisfaction of judgment. On March 24, 2008, at Post's direction, Martini made a nighttime drive to Malibu, where Post gave him $100,000 in cash.

Following the settlement and Little's lawsuit regarding the fee award, Martini no longer hired Little, even though he had no hard feelings toward his former counsel. According to Martini, his decision not to rehire Little was

---

[3] Although Martini and the other Martini parties were named as defendants, they presented no evidence in their own defense, aside from the testimony that Martini provided in connection with Little's case.

based on Little's action against him; in addition, Martini had established a relationship with a new law firm and did not want to disturb it.[4]

### b. *Amber's Evidence*

Post testified that he had owned Amber since 1998. According to Post, in late March 2008, Martini approached him regarding a settlement of the action involving Amber. Post denied that their negotiations addressed a potential malicious prosecution action; moreover, he asserted that he had no concerns regarding such an action, as he believed that Amber's claims against the Martini parties were meritorious. Post and Martini agreed to a "walk away" settlement, under which Amber abandoned its appeal and the Martini parties executed acknowledgments of satisfaction of judgment. Neither side was obliged to pay funds to the other. Post further testified that the settlement agreement was intended to extinguish Amber's obligation to pay the attorney fee award. Post was uncertain whether he first became aware of Little's attorney lien before or after the parties agreed to settle the action.

Pollok, Amber's attorney, testified that during the settlement negotiations, Martini never suggested that he was considering a malicious prosecution action. According to Pollok, he first became aware of Little's lien when he received a letter dated March 20, 2008, from Little. The letter described the lien and was accompanied by a formal lien notice. In a reply dated June 25, 2008, Pollok told Little that although the settlement encompassed the fee award, it did not improperly impair Little's lien, as Amber and the Martini parties had entered into a "walk away" settlement under which no money exchanged hands. Pollok maintained that the lien attached only to funds actually paid to the Martini parties under the attorney fee order.[5]

### 3. *Special Verdicts and Judgment*

The jury was instructed on three causes of action: two claims against Amber for intentionally inducing a breach of contract and intentionally interfering with a contract, and a claim against the Martini parties for breach of contract.[6] On June 29, 2010, the jury returned its special verdicts.

---

[4] Little also presented testimony from Robert L. Savannah, Martini's chauffeur, who stated that on the evening of March 24, 2008, he drove Martini to Malibu. According to Savannah, Martini left the car, entered a building, and returned with a black briefcase. When Martini looked inside the bag, he was "real joyful."

[5] Amber also submitted testimony from Ron Goldman, who owned the Malibu building in which Amber leased its offices. According to Goldman, Amber was not a tenant in the building on March 24, 2008.

[6] During the trial, the court granted a nonsuit motion regarding Little's claim for conversion, and Little later abandoned his remaining claims for equitable relief.

Regarding the tort claims against Amber, the jury found that Amber had induced the Martini parties to breach their contract with Little, resulting in $190,684.06 in general damages and no special damages; in addition, the jury found that Amber had interfered with the Martini parties' contract with Little, resulting in no general damages and $692,307.68 in special damages. In connection with the breach of contract claim against the Martini parties, the special verdict form directed the jury not to determine Little's damages if the jury found that the Martini parties had breached the contract and that Amber had caused them to do so. The jury made the latter findings, and left blank the space provided for damages in the special verdict form. In addition, the jury found that the Martini parties had received $100,000 in connection with the settlement.

On July 16, 2010, the trial court entered judgment in accordance with the special verdicts. On August 23, 2010, after denying Amber's motions for a new trial and judgment notwithstanding the verdict, the court entered an amended judgment to reflect the imposition of a Franchise Tax Board lien. This appeal followed.

## DISCUSSION

Amber challenges the judgment on several grounds, arguing that the interference claims fail as a matter of law and for want of substantial evidence. Amber contends (1) that a contractual attorney's lien does not oblige the client to refrain from entering into a settlement that nullifies the attorney's recovery under the lien, (2) that the jury was misinstructed regarding Little's rights under the lien, and (3) that the special verdicts regarding damages are defective. For the reasons explained below, we discern no reversible error.

### A. *Governing Principles*

Generally, an attorney's lien is "equitable in nature." (*Brienza v. Tepper* (1995) 35 Cal.App.4th 1839, 1847 [42 Cal.Rptr.2d 690].) As our Supreme Court has explained, an attorney's lien is " 'an equitable right to have the fees and costs due to him for services in a suit secured to him out of the judgment or recovery in the particular action, the attorney to the extent of such services being regarded as an equitable assignee of the judgment. It is based . . . on the natural equity that a party should not be allowed to appropriate the whole of a judgment in his favor without paying for the services of his attorney in obtaining such judgment.' " (*Isrin v. Superior Court* (1965) 63 Cal.2d 153, 158–159 [45 Cal.Rptr. 320, 403 P.2d 728], italics omitted (*Isrin*), quoting *Tracy v. Ringole* (1927) 87 Cal.App. 549, 551 [262 P. 73].) Nonetheless, liens of this type " 'do not operate to transfer a part of the

cause of action to the attorney.' " (*Isrin, supra*, at p. 159, quoting *Fifield Manor v. Finston* (1960) 54 Cal.2d 632, 641 [7 Cal.Rptr. 377, 354 P.2d 1073].) In securing such a lien, the attorney acquires a "professional interest" in the action, but not "the beneficial rights of a real party in interest." (*Isrin, supra*, at p. 161.)

An attorney's lien is ordinarily created by contract. (*Cetenko v. United California Bank* (1982) 30 Cal.3d 528, 531 [179 Cal.Rptr. 902, 638 P.2d 1299] (*Cetenko*); *Isrin, supra*, 63 Cal.2d at p. 157.) Although contingency fee agreements do not automatically create an attorney's lien, they impose a lien when "the parties have manifested an intention that the attorney shall look to the judgment as security for his fee." (*Isrin, supra*, 63 Cal.2d at p. 157.) Alternatively, an attorney's lien may be created by an agreement under which the attorney defers his or her fee. (*Cetenko, supra*, 30 Cal.3d at pp. 531–536.) Here, Little's retainer agreement with Martini and Sharma expressly provided for a lien on any attorney fee award in exchange for the deferral of a portion of Little's fees. In *Cetenko*, our Supreme Court held that a materially similar retainer agreement created a valid attorney's lien. (*Ibid.*) Amber does not dispute that Little's retainer agreement also did so.

■ A third party that impairs an attorney's rights under such a lien may be subject to liability for tortious interference with contractual relations or prospective economic advantage. (*Siciliano v. Fireman's Fund Ins. Co.* (1976) 62 Cal.App.3d 745, 752–753 [133 Cal.Rptr. 376].) Here, Little asserted claims against Amber for intentionally inducing a breach of contract and intentionally interfering with the performance of a contract. ■ The two torts, though related, are distinct. (*Shamblin v. Berge* (1985) 166 Cal.App.3d 118, 122–123 [212 Cal.Rptr. 313].) "The first [tort] protects against intentional acts designed to produce an actual breach and requires that a plaintiff prove: '(1) he had a valid and existing contract [with a third party]; (2) . . . defendant had knowledge of the contract and intended to induce its breach; (3) the contract was in fact breached by the contracting party; (4) the breach was caused by . . . defendant's unjustified or wrongful conduct; and (5) . . . damage[s] [were suffered as a result].' [Citation.] The second [tort] is slightly broader in that it protects against intentional acts not necessarily resulting in a breach. [Citations.] It requires that a plaintiff prove: (1) he had a valid and existing contract with a third party; (2) defendant had knowledge of this contract; (3) defendant committed intentional and unjustified acts designed to interfere with or disrupt the contract; (4) actual interference with or disruption

of the relationship; and (5) resulting damages."[7] (*Shamblin*, at pp. 122–123, quoting *Dryden v. Tri-Valley Growers* (1977) 65 Cal.App.3d 990, 995 [135 Cal.Rptr. 720].)

To the extent Amber challenges the jury's factual determinations, we examine the record for substantial evidence to support the findings. (*Donovan v. Poway Unified School Dist.* (2008) 167 Cal.App.4th 567, 581–582 [84 Cal.Rptr.3d 285].) On review for substantial evidence, "all of the evidence must be examined, but it is not weighed. All of the evidence most favorable to the respondent must be accepted as true, and that unfavorable discarded as not having sufficient verity, to be accepted by the trier of fact. If the evidence so viewed is sufficient as a matter of law, the judgment must be affirmed." (*Estate of Teel* (1944) 25 Cal.2d 520, 527 [154 P.2d 384].) In contrast, we independently review the trial court's resolution of questions of law. (*Home Depot, U.S.A., Inc. v. Contractors' State License Bd.* (1996) 41 Cal.App.4th 1592, 1599 [49 Cal.Rptr.2d 302].)

### B. *Attorney's Lien*

Amber contends that Little's interference claims fail because the Martini parties' conduct in settling the prior action did not breach Little's retainer agreement or improperly interfere with his lien. Amber argues (1) that Little's lien did not limit the Martini parties' entitlement to settle the action, and (2) that the lien "evaporated" as a result of the settlement, which prevented a recovery under the fee award. Amber thus asserts that because the settlement rendered the lien valueless, Little's interference claims are "valueless as well." We reject this contention. As explained below, a client who creates an attorney's lien through a fee agreement may undertake a contractual obligation not to frustrate the attorney's recovery under the lien.

■ We begin by examining an attorney's right to funds or property under a lien. As noted above (see pt. A. of the Discussion, *ante*), an attorney's lien is classified as "equitable." Generally, "[a]n equitable lien is a right to subject property not in the possession of the lienor to the payment of a debt as a charge against that property." (*Farmers Ins. Exchange v. Zerin* (1997) 53 Cal.App.4th 445, 453 [61 Cal.Rptr.2d 707].) In the case of an attorney's lien,

---

[7] These torts differ in two principal ways from a third related tort, namely, intentional interference with prospective economic advantage. The former torts require an existing contract, whereas the latter presupposes only a prospective relationship. (*Della Penna v. Toyota Motor Sales, U.S.A., Inc.* (1995) 11 Cal.4th 376, 392–393 [45 Cal.Rptr.2d 436, 902 P.2d 740].) Furthermore, to establish the latter tort, the plaintiff must show that the defendant engaged in conduct that was wrongful by some legal measure, independent of its impact on the prospective relationship. (*Id.* at p. 393.) This requirement of independent wrongfulness does not apply to the former torts. (*Quelimane Co. v. Stewart Title Guaranty Co.* (1998) 19 Cal.4th 26, 56 [77 Cal.Rptr.2d 709, 960 P.2d 513].)

the attorney's right to the specified property comes into existence at the time of the attorney-client agreement. As the court explained in *Saltarelli & Steponovich v. Douglas* (1995) 40 Cal.App.4th 1, 6 [46 Cal.Rptr.2d 683]: "An attorney's lien arises upon execution of the retainer agreement. [Citations.] While a discharged attorney must file an independent action to establish the amount of the lien and to enforce it [citations], a judgment on the lien is not a condition precedent to its existence or viability." Nonetheless, when the attorney's lien is tied to the client's contingent recovery of property, for example, an award of attorney fees and costs, the attorney cannot enforce the lien until the contingency occurs. (*Kroff v. Larson* (1985) 167 Cal.App.3d 857, 861 [213 Cal.Rptr. 526].) Accordingly, the lien is rendered unenforceable when the occurrence of the contingency is conclusively foreclosed. (See *ibid.*)

We turn to the client's obligations regarding a contractual attorney lien that is linked to a contingent recovery. Although it is clear that the client's obligation to reimburse the attorney under such a lien does not "mature[]" until "the occurrence of the agreed contingency" (*Kroff v. Larson, supra*, 167 Cal.App.3d at p. 861), no published case has examined the extent to which the client is subject to contractual obligations regarding a lien under the circumstances presented here. At the outset of our inquiry, we clarify these circumstances. As elaborated below, under Little's fee agreement, his lien attached to "any attorney[] fee award made by the Court." At the time of the settlement, the fee award had been made. Although open to an appeal or other possibilities that could disturb it, the award was never appealed, vacated or modified. The award thus became a final judicial determination of Amber's liability to the Martini parties.

It is undisputed that at the time of the settlement, Little had secured a judgment in favor of the Martini parties, and the court had made an award of $152,700 in attorney fees. Although Amber noticed no appeal directly from the March 2008 fee award or the amended judgment that incorporated it, nothing in the record suggests that the award was beyond a timely appeal in June 2008, when the Martini parties acknowledged satisfaction of the judgment and Amber abandoned its appeal from the December 2007 judgment.[8] There is no evidence that Amber had less than 180 days from the date of the award to file a timely appeal or that Amber was subject to the 60-day filing rule. (Cal. Rules of Court, rule 8.104(a).)

However, no appeal was taken from the award, and the parties' settlement did not purport to disturb it or prevent it from becoming a final judicial determination of Amber's liabilities. In *Pon v. Fremont Indemnity Co.* (1990)

---

[8] Because the December 2007 judgment neither determined the Martini parties' entitlement to fees nor awarded any amount of fees, the fee award was separately appealable. (*DeZerega v. Meggs* (2000) 83 Cal.App.4th 28, 43–44 [99 Cal.Rptr.2d 366].)

217 Cal.App.3d 29, 33 [265 Cal.Rptr. 733], the plaintiff obtained a money judgment in her favor from which the defendant noticed an appeal. The parties entered into a settlement under which the defendant agreed to dismiss his appeal in exchange for a partial payment of the damages, together with the plaintiff's execution of a partial acknowledgment of satisfaction of judgment and agreement not to execute on the balance of the damages award. (*Id.* at pp. 30–31.) Following the settlement, the plaintiff initiated a bad faith action against the defendant's insurer, which obtained a summary judgment in its favor on the ground that the settlement nullified the judgment regarding the defendant's liability in the prior action. (*Id.* at pp. 31–33.) In reversing, the appellate court held that the prior judgment, rather than the settlement, constituted a final determination of the defendant's liability, as nothing in the terms of the settlement "purported to set aside the underlying judgment." (*Id.* at p. 33.)

The same is true of the settlement here. In settling the action, the Martini parties executed acknowledgments of satisfaction of judgment that they "ha[d] accepted payment or performance other than that specified in the judgment in full satisfaction of the judgment," but nothing in the acknowledgments or settlement purported to vacate the award or modify its terms. As the award is now beyond appeal, it constitutes a final determination regarding Amber's liability to the Martini parties under the fee provisions of their contracts, despite the settlement. However, because "a satisfaction of judgment is the last act and end of the proceedings," the Martini parties' acknowledgments terminated their right to recover the fee award made by the court. (*Brochier v. Brochier* (1941) 17 Cal.2d 822, 825–826 [112 P.2d 602].)

Precisely put, the question before us is whether the Martini parties breached a contractual duty to Little regarding his lien in settling the action with Amber and forfeiting their right to execute on the fee award. We find guidance on this issue from *Epstein v. Abrams* (1997) 57 Cal.App.4th 1159 [67 Cal.Rptr.2d 555] (*Epstein*). There, an attorney represented the defendants and cross-complainants in a breach of contract action under a fee agreement that purported to create an attorney's lien against a recovery under the judgment. (*Id.* at pp. 1163–1164.) After the attorney succeeded in obtaining summary judgment on behalf of one of his clients, the client was dismissed from the action and the trial court issued a contractual attorney fee award in the client's favor. (*Ibid.*) Although the plaintiffs noticed an appeal from the award, they apparently took no effective action to prevent an execution on the fee award, as the attorney levied assets from them valued at approximately 40 percent of the award. (*Ibid.*) Despite the levy, the client declined to pay any fees to the attorney. (*Id.* at p. 1164.) As a result, the attorney withdrew from the representation, served notices of his lien on all parties, and began an independent action to enforce the lien. (*Ibid.*) After the client restored the levied assets to the plaintiffs, they dismissed their appeal and asked the trial

court to approve a global settlement of the action under which the client was to execute a satisfaction of judgment regarding the fee award. (*Id.* at pp. 1165–1166.) The court granted the request. (*Ibid.*)

■ This court reversed the ruling, holding that the trial court lacked jurisdiction to approve the settlement, as the validity of the attorney's lien could be determined only in the attorney's independent action. (*Epstein, supra,* 57 Cal.App.4th at pp. 1166–1167.) In the alternative, we concluded that even if the trial court had the authority to approve the settlement, it abused its discretion in doing so. (*Id.* at p. 1169.) We determined that the plaintiffs had acted improperly in seeking approval of the settlement despite notice of the attorney's lien, as our Supreme Court had stated that when a contingent fee agreement creates such a lien, " ' "neither the client nor the opposite party, if the latter has knowledge of the attorney's rights . . . , can so compromise the litigated subject matter as to defeat the attorney's rights." ' " (*Id.* at p. 1170, italics omitted [quoting *Jones v. Martin* (1953) 41 Cal.2d 23, 27–28 [256 P.2d 905], overruled on another ground in *Fracasse v. Brent* (1972) 6 Cal.3d 784, 791–792 [100 Cal.Rptr. 385, 494 P.2d 9]].) We further concluded that this principle was applicable to the pertinent lien, regardless of whether it was created under a contingency fee agreement or a deferred fee agreement.[9] (*Epstein, supra,* at p. 1169, fn. 6.)

Although the opinion in *Epstein* did not expressly examine the client's contractual obligations to his attorney in connection with the settlement, it necessarily concluded that the client, like the plaintiffs, acted improperly under the fee agreement in agreeing to settle the action. As explained above (see pt. A. of the Discussion, *ante*), clients who execute lien-creating fee agreements give their attorneys " 'an equitable right,' " the basis of which is " 'the natural equity that a party should not be allowed to appropriate the whole of a judgment in his favor without paying for the services of his attorney in obtaining such judgment.' " (*Isrin, supra,* 63 Cal.2d at pp. 158–159.) Accordingly, clients who create such a right are obligated under the agreement to honor the right.

■ As the circumstances in *Epstein* closely resemble those presented here, we conclude that the Martini parties breached their fee agreement with Little in executing the acknowledgments of satisfaction of judgment related to the settlement. In each case, the fee award had been made, but was not beyond appeal when the parties tried to complete the settlement; the clients obtained funds they could have used to begin discharging their contractual duties under the lien, but they did not do so in order to effectuate the settlement; and the settlement itself effectively denied the attorney any

---

[9] The record in *Epstein* apparently did not disclose whether the lien relied on a contingency fee agreement or a deferred fee agreement. (*Epstein, supra,* 57 Cal.App.4th at p. 1169, fn. 6.)

recovery under the fee award without vacating or disturbing the award. Accordingly, the Martini parties contravened the fee agreement in settling the action, as they " 'appropriate[d] the whole of a judgment in [their] favor without paying for the services of [their] attorney' " (*Isrin, supra*, 63 Cal.2d at pp. 158–159).

*Beard v. Goodrich* (2003) 110 Cal.App.4th 1031 [2 Cal.Rptr.3d 160] (*Beard*), upon which Amber relies for the proposition that the settlement properly extinguished Little's lien-related rights to his fees, is distinguishable. In *Beard*, an attorney represented a party in an action pursuant to a contingency fee agreement containing no reference to an attorney's lien. (*Id.* at p. 1033.) After the attorney obtained a money judgment and attorney fee award in his client's favor, the parties entered into a settlement—apparently, with the attorney's assistance—that expressly vacated the judgment and fee award. (*Id.* at pp. 1036–1037.) Following the settlement, the trial court determined the attorney fees by reference to the client's recovery under the settlement, rather than the fee award. (*Id.* at p. 1034.) In affirming, the appellate court concluded that the attorney's right to have his fees fixed by reference to the fee award "was extinguished when the judgment was vacated." (*Id.* at p. 1036.) *Beard* thus involved a settlement that expressly vacated a fee award; moreover, as the attorney never suggested that his contingency fee agreement created a lien, the appellate court did not address or examine the effect of the settlement on any lien-related rights.

■ Amber also contends that notwithstanding the fee agreement, the Martini parties had the right to settle the action in any manner they chose, even if the settlement prevented Little's recovery under the lien. We disagree. Generally, a provision in an attorney-client fee agreement "that the client may not compromise the suit without the consent of his attorney is against public policy and void." (*Calvert v. Stoner* (1948) 33 Cal.2d 97, 103 [199 P.2d 297].) The foundation of this rule is the public policy favoring the settlement of disputes. (*Ibid.*) Nonetheless, fee agreements containing reasonable limitations on the client's authority to settle an action are enforceable. (*Ramirez v. Sturdevant* (1994) 21 Cal.App.4th 904, 918 [26 Cal.Rptr.2d 554] (*Ramirez*).)

In *Ramirez*, a discharged employee hired an attorney on a contingency fee basis to represent her in an action against her former employer. (*Ramirez, supra*, 21 Cal.App.4th at pp. 910–911.) When the action ended with a judgment unfavorable to the employee, the attorney agreed to represent her on appeal, provided that she would accept any settlement offer of at least $150,000. (*Id.* at pp. 910–912.) The appellate court concluded that this limitation on the client's authority to settle the action was valid and enforceable, as it promoted a settlement for a reasonable estimate of the value of the employee's claims while preserving the attorney's right to compensation, and

the attorney took no unfair advantage of the client in negotiating the limitation. (*Id.* at pp. 917–918.) The court stated: "We cannot fault an attorney who has spent, or who anticipates spending, a substantial amount of time prosecuting a case under a contingency fee agreement, for being concerned that the client might reject a reasonable settlement offer. Such a rejection risks that the client, and thus the attorney, ultimately will recover nothing and be out-of-pocket the incurred costs of litigation." (*Id.* at p. 918.)

In view of *Ramirez*, the Martini parties' fee agreement was valid and enforceable, insofar as it ensured Little his right to "any fee award made by the court" without regard to the terms on which his clients ultimately chose to settle. As explained in *Cetenko*, lien-creating deferred fee agreements serve important public policies, as they permit persons with meritorious claims to obtain legal representation despite their inability to pay. (*Cetenko, supra*, 30 Cal.3d at p. 536.) Furthermore, to the extent Little's lien on the fee award imposed a restriction on any settlement the Martini parties entered into, it did not impose an unreasonable minimal value on a permissible settlement: the amount of the fee award has never been challenged, and the fee award itself is now final. In addition, there is no evidence that the lien provisions of the fee agreement were the product of unfair negotiations; on the contrary, Martini testified that the fee award properly belonged to Little, and that he had tried to protect Little's lien in negotiating the settlement.

Amber's reliance on *Hall v. Orloff* (1920) 49 Cal.App. 745 [194 P. 296] and *Lemmer v. Charney* (2011) 195 Cal.App.4th 99 [125 Cal.Rptr.3d 502] is misplaced. In each case, the appellate court held that an attorney's claim against his client failed because it relied on an agreement that prevented the client from resolving the action without the attorney's consent. (*Hall v. Orloff, supra*, 49 Cal.App. at pp. 747–748 [fee agreement was unenforceable because it required the client not to dismiss or settle action without attorney's consent, and imposed penalty upon the client if he did so]; *Lemmer v. Charney, supra*, 195 Cal.App.4th at pp. 104–105 [attorney could not assert fraud claim predicated on client's promise to proceed to trial or settlement, rather than dismissing action].) Here, the fee agreement did not transfer control of the action from the Martini parties to Little or require his consent for settlement of the action; rather, it obligated the Martini parties to honor their contractual duties to Little concerning his lien right to "any attorney[] fee award made by the court," regardless of how they chose to settle the action.[10] In sum, the Martini parties' conduct in connection with the settlement breached their contractual obligations regarding Little's lien.

[10] *In the Matter of Van Sickle* (Review Dept. 2006) 4 Cal. State Bar Ct. Rptr. 980 [2006 WL 2465633, p. *10], upon which Amber also relies, is inapposite for other reasons. There, the review department concluded that an attorney acted improperly in requiring his client to give him a lien upon her house without advising her to consult another attorney. Here, Little engaged in no such misconduct, as it is undisputed that he so advised the Martini parties.

## C. *Instructional Error*

Amber contends that the jury was misinstructed regarding Little's rights under the lien. The trial court informed the jury: "A lien in favor of an attorney does not operate to transfer any part of the client's cause of action. It does, however, give him a lien upon any recovery. And the attorney is regarded as the *true owner* of the judgment [or] settlement, the extent of the fees and costs which are due to him. [¶] *When there exists a valid attorney's lien, neither the attorney's client nor the opposing counsel or opposing counsel's clients can settle or otherwise compromise a litigated subject matter so as to defeat the attorney's rights.*" (Italics added.) Amber maintains that the italicized portions of this instruction are incorrect.[11] We find no reversible error.

We agree that the phrase "true owner" was potentially misleading insofar as it suggested that Little's lien gave him rights greater than those of an " 'equitable assignee,' " or rendered him "a real party in interest" in the prior action. (*Isrin, supra,* 63 Cal.2d at pp. 158–159, 161.) However, for the reasons explained above (see pt. B. of the Discussion, *ante*), the remaining italicized portion of the instruction was not erroneous under the undisputed facts of this case, including the fact that Amber had notice of Little's lien prior to the settlement.

In any event, any error arising from the use of the phrase "true owner" was harmless. Generally, instructional error is prejudicial only if it is "reasonably probable defendant would have obtained a more favorable result in its absence. [Citations.]" (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 570 [34 Cal.Rptr.2d 607, 882 P.2d 298].) " '[P]robability' in this context does not mean more likely than not, but merely a reasonable chance, more than an abstract possibility. [Citations.]" (*College Hospital Inc. v. Superior Court* (1994) 8 Cal.4th 704, 715 [34 Cal.Rptr.2d 898, 882 P.2d 894], italics omitted.) In assessing the prejudicial impact of erroneous instructions, we view the evidence in the light most favorable to the party claiming error. (*Sesler v. Ghumman* (1990) 219 Cal.App.3d 218, 223 [268 Cal.Rptr. 70].)

In our view, it is not reasonably likely that there would have been a different outcome had the phrase "true owner" been replaced by a more accurate term. The jury was asked only to determine whether the Martini parties' conduct in settling the action breached their fee agreement with Little, and whether Amber's conduct caused the breach or otherwise interfered with the performance of the fee agreement. As these determinations did

---

[11] Little maintains that Amber forfeited this contention because it agreed to the use of the phrase "true owner" at an unreported bench conference on instructions. However, the record discloses no forfeiture, as Amber objected to the instructions on the record immediately after the bench conference and later at trial.

not require the jury to assess whether Little had rights exceeding his status as equitable assignee under the contractual lien, the use of the phrase in the instruction was unlikely to have influenced their findings. In sum, there was no reversible instructional error.[12]

### D. *Damages*

Amber challenges the award of damages to Little on several grounds. As explained below, we reject these contentions.

#### 1. *Special Verdict on Breach of Contract Damages*

Amber contends the award of damages for inducing a breach of contract fails as a matter of law because the jury awarded no damages against the Martini parties for breach of the fee agreement. Amber maintains that award of damages for inducing a breach of contract cannot be reconciled with the jury's special verdict awarding no damages for breach of contract. As explained below, Amber has forfeited this contention.

■ Potentially defective special verdicts are subject to "a multilayered approach." (*Zagami, Inc. v. James A. Crone, Inc.* (2008) 160 Cal.App.4th 1083, 1091 [74 Cal.Rptr.3d 235] (*Zagami*).) Prior to the jury's discharge, the trial court is obliged upon request to ask the jury to correct or clarify a potentially ambiguous or inconsistent verdict. (*Ibid.*) If the verdict is "merely ambiguous," a party's failure to seek clarification of the verdict before the jury is discharged may work a forfeiture of the purported defect on appeal, "particularly if the party's failure to object was to reap a ' "technical advantage" ' or to engage in a ' "litigious strategy." ' " (*Id.* at p. 1092, fn. 5, quoting *Woodcock v. Fontana Scaffolding & Equip. Co.* (1968) 69 Cal.2d 452, 457 [72 Cal.Rptr. 217, 445 P.2d 881].) However, absent a forfeiture, courts

---

[12] Amber also suggests the trial court erred in instructing the jury as follows: "When a trial court, after reaching judgment on the merits of a case, subsequently issues a separate order awarding attorney[] fees to the prevailing party, the order awarding attorney[] fees must be separately appealed to the Court of Appeal. Failure to file a separate appeal in a timely fashion from a post-judgment order awarding attorney[] fees renders the attorney[] fees final and unappealable." Amber argues that this instruction failed to state that Amber's appeal from the December 2007 judgment potentially (1) stayed enforcement of the fee award and (2) subjected the award to the possibility of reversal if Amber prevailed in its appeal.

We discern no reversible error. As explained above (see pt. B. of the Discussion, *ante*), the instruction was correct under the facts of this case; moreover, notwithstanding the contingencies to which the fee award was subject at the time of the settlement, the award was sufficiently firm to support Little's claim that the Martini parties breached a contractual duty to him in settling the action. Accordingly, it is not reasonably likely there would have been a different outcome had the jury heard additional instructions regarding the contingencies in question.

may properly interpret a "merely ambiguous" verdict in light of the pleadings, evidence, and instructions. (*Id.* at p. 1092, fn. 5.) In contrast, if the special verdicts are " 'hopelessly ambiguous' " or inconsistent, failure to seek clarification from the jury does not create a forfeiture, and the proper remedy is ordinarily a retrial on the issues underlying the defective verdict. (*Id.* at p. 1092.)

We conclude that because the special verdict in question is no more than "merely ambiguous," Amber forfeited its contention by failing to seek clarification from the jury before it was dismissed. (*Zagami, supra,* 160 Cal.App.4th at p. 1092, fn. 5.) Little testified that although the Martini parties had a contractual obligation to pay his fees, he sought a recovery of damages only from Amber, which he maintained was responsible for his former clients' failure to pay the fees. He stated that because his retainer agreement gave him an "absolute right" to collect the fee award from Amber, seeking the same sum from the Martini parties would be "a double recovery." He further stated that he had sued the Martini parties only because their presence was required in the action "as a procedural matter" and they were contractually obligated to pay his fees. He was "not looking to [the Martini parties] to get paid" because they would not have entered into the settlement "but for the false representations made to them" by Amber.

In accordance with Little's testimony, the special verdict form expressly directed the jury *not* to determine Little's damages if the jury found that the Martini parties had breached the contract and that Amber had caused them to do so. The jury found that Amber had induced the Martini parties to breach their contract with Little, resulting in $190,684.06 in general damages and no special damages, and that Amber had interfered with the contract, resulting in no general damages and $692,307.68 in special damages. The jury further found that the Martini parties breached the contract and that Amber had caused the breach but, as instructed, left blank the space provided for an amount of damages in the special verdict form. Prior to the jury's discharge, Amber asked the jurors to be polled with respect to certain special verdicts. However, Amber sought no clarification whether the jury, in failing to enter an amount under the special verdict regarding damages for breach of contract, intended to prevent a double recovery, rather than to find that Little suffered no damages.

Under the circumstances, the blank special verdict cannot be regarded as more than "merely ambiguous." (*Zagami, supra,* 160 Cal.App.4th at p. 1092, fn. 5.) In view of Little's testimony and the jury's inquiry regarding the special verdicts, the jury's failure to state an amount of damages can reasonably be viewed only as an attempt to prevent a double recovery of Little's fees from the Martini parties, rather than a finding of no damages.

Because Amber never sought clarification from the jury, Amber has forfeited its contention that the jury found that the breach caused no damages. (See *Henrioulle v. Marin Ventures, Inc.* (1978) 20 Cal.3d 512, 521 [143 Cal.Rptr. 247, 573 P.2d 465] ["Failure to object to a verdict before the discharge of a jury and to request clarification or further deliberation precludes a party from later questioning the validity of that verdict if the alleged defect was apparent at the time the verdict was rendered and could have been corrected."].)

For the same reasons, we would reject Amber's contention were we to address it on the merits. As the jury found that Little had suffered $190,684.06 in general damages because Amber had induced the Martini parties to breach their contract, the jury could not rationally have found that Little had not suffered the *same* damages for the Martini parties' breach. (See *OCM Principal Opportunities Fund, L.P. v. CIBC World Markets Corp.* (2007) 157 Cal.App.4th 835, 882 [68 Cal.Rptr.3d 828] [record established that jury's special verdict of "$0" under claim was intended only to prevent double recovery of damages awarded in connection with another claim].)

Amber suggests that the judgment in favor of the Martini parties on Little's breach of contract claim operates as a finding that the breach of the contract caused no damages, arguing that the judgment would bar Little from reasserting his claim against the Martini parties. However, under the doctrine of collateral estoppel, a judgment constitutes a binding determination on a factual issue only when the issue was "necessarily decided." (*People v. Garcia* (2006) 39 Cal.4th 1070, 1077 [48 Cal.Rptr.3d 75, 141 P.3d 197].) As explained above, the record establishes that the jury made no determination that the Martini parties' breach of contract did not result in damages to Little.

### 2. *Fee-related Damages*

 Amber contends the damages award for inducing a breach of contract fails for want of substantial evidence regarding its knowledge of Little's retainer agreement. As Witkin explains, to induce a breach of contract, "[t]he defendant must know of the contract, and must intend to interfere with contractual relations. [Citations.] However, the defendant's primary purpose need not be disruption of the contract. It is sufficient if the interference is known by him or her to be a necessary consequence of his or her action. [Citations.]" (5 Witkin, Summary of Cal. Law (10th ed. 2005) Torts, § 736, pp. 1062–1063.)

Amber argues there is insufficient evidence that it knew of the fee provisions in Little's retainer agreement when it negotiated the settlement. Little sought $190,684.06 in damages for unrecovered contract-based fees, comprising the $152,700 fee award and approximately $37,984 in unpaid

nondeferred fees. The jury awarded these damages against Amber for inducing a breach of contract. Amber maintains that each component of the damages award fails because there is no evidence that it knew of the lien and deferred fee provisions of Little's retainer agreement. We disagree.

To recover damages for inducing a breach of contract, the plaintiff need not establish that the defendant had full knowledge of the contract's terms. Comment i to Restatement Second of Torts, section 766, pages 11–12, states: "To be subject to liability [for inducing a breach of contract], the actor must have knowledge of the contract with which he is interfering and of the fact that he is interfering with the performance of the contract. Although the actor's conduct is in fact the cause of another's failure to perform a contract, the actor does not induce or otherwise intentionally cause that failure if he has no knowledge of the contract. But it is not necessary that the actor appreciate the legal significance of the facts giving rise to the contractual duty, at least in the case of an express contract. If he knows those facts, he is subject to liability even though he is mistaken as to their legal significance and believes that the agreement is not legally binding or has a different legal effect from what it is judicially held to have."

Here, there is ample evidence that Amber had sufficient knowledge of Little's contractual attorney lien when it induced the Martini parties to execute the acknowledgments of satisfaction of judgment. Pollok acknowledged that he first became aware of the lien through a letter dated March 20, 2008, from Little, which stated: "Please be advised that I have a *contractual* attorney's lien . . . which entitles me to retain any attorney[] fee[] award." (Italics added.) In addition, Martini testified that during the settlement negotiations, he shared with Post the contents of a letter dated March 19, 2008, from Little. The letter stated: "I have an agreement with [the Martini parties] by which I am entitled to 100 [percent] of any attorney[] fee[] award."

Although there is no evidence that Amber also had specific knowledge of the deferred fee provisions of Little's retainer argument, Amber is liable for *all harm* flowing from its conduct in inducing the Martini parties to breach their contractual duties regarding the lien. (*Duff v. Engelberg* (1965) 237 Cal.App.2d 505, 507–508 [47 Cal.Rptr. 114].) Little testified that Amber's misrepresentations in inducing the Martini parties to settle the action also prompted them not to pay his outstanding nondeferred fees. In addition, Martini testified that although he received $100,000 to effectuate the settlement, Post specifically required him not to disclose the payment to Little. Martini further testified that he never revealed the payment to Little until Little deposed him in the underlying action. This evidence supports the reasonable inference that Amber's deceptive conduct in inducing the Martini

parties to breach their duties regarding Little's lien also eroded the contractual relationship between Little and his clients, resulting in their failure to pay Little's nondeferred fees. In sum, the record discloses sufficient evidence for the damages award regarding inducing a breach of contract.

### 3. *Lost Profits*

Amber contends the damages award for interfering with a contract fails for want of substantial evidence regarding Little's lost profits. Amber argues there is insufficient evidence to support a recovery for lost profits on new contracts beyond the retainer agreement with which it interfered; in addition, Amber argues that Little provided only conjectural or speculative evidence regarding the amount of the lost future profits. We reject these contentions.[13]

In seeking lost future profits, Little presented evidence that prior to the settlement, the Martini parties consistently hired him to handle their legal matters. Little testified that they had paid him an average of $150,000 per year for the previous eight years, resulting in annual profits of $82,000. He expected his relationship with the Martini parties to continue for another 12 years (until he turned 65), resulting in lost future profits totaling $984,000. In connection with Little's claim for interference with a contract, the jury awarded Little $692,307.68 in special damages.

Amber contends that Little's recovery of lost profits from future contracts fails because he presented no evidence of an ongoing agreement with the Martini parties that grounded the future contracts. Amber argues that under a claim for interference with a contract, Little was entitled to recover lost profits from future contracts only if he showed the existence of an underlying contract; in the absence of such a contract, Amber maintains, Little was obliged to present evidence supporting a claim for interference with prospective economic advantage, which he did not do.

In our view, to recover lost profits from future contracts under a claim for interference with a contract, Little was not obliged to show the existence of an ongoing foundational agreement. We recognize that interference with an existing contract is analytically distinct from interference with

---

[13] Amber also suggests that Little is not entitled to lost future profits because he neither pleaded them as special damages in his complaint nor identified them as an item of special damages during discovery. However, Amber has forfeited these contentions, as it first objected to the defect in the complaint after the presentation of evidence at trial (*Stoltz v. Converse* (1946) 75 Cal.App.2d 909, 916 [172 P.2d 78] ["[I]f evidence of [special damages] is received without objection[,] the objection that they were not pleaded is waived."]), and the pertinent discovery responses were not admitted at trial (*Frank v. County of Los Angeles* (2007) 149 Cal.App.4th 805, 815 [57 Cal.Rptr.3d 430] [parties may not challenge adequacy of evidence supporting jury verdicts on the basis of documents not admitted at trial]).

prospective economic advantage, as the torts protect different interests. (*Della Penna v. Toyota Motor Sales, U.S.A., Inc., supra*, 11 Cal.4th at p. 392.) Our Supreme Court has instructed that courts must "firmly distinguish the two kinds of business contexts, bringing a greater solicitude to those relationships that have ripened into agreements." (*Ibid.*)

Nonetheless, as noted above (see pt. D.2., *ante*), Amber was liable for all the harm that it caused in interfering with Little's retainer agreement with the Martini parties. Little was thus entitled to recover lost profits (if any) flowing from Amber's misconduct. (See *Elsbach v. Mulligan* (1943) 58 Cal.App.2d 354, 366–368 [136 P.2d 651].) Under these principles, when a tort disturbs an established business engaged in sales, the business may recover lost profits from *prospective* sales. (*Grupe v. Glick* (1945) 26 Cal.2d 680, 692 [160 P.2d 832].) Analogously, we conclude that Little was entitled to recover lost profits from prospective sales of his services to the Martini parties, upon a sufficient showing that Amber's misconduct regarding Little's retainer agreement caused the loss of the prospective sales.

Amber also contends that Little made no such showing. Noting Little's testimony that he tried to withdraw his representation in connection with Amber's appeal from the December 2007 judgment, Amber argues that Little ended his relationship with the Martini parties before the settlement, and that there was no evidence that they would have continued to hire Little in the absence of the settlement. We disagree.

Amber's argument misapprehends our role as an appellate court. Review for substantial evidence is not trial de novo. (*OCM Principal Opportunities Fund, L.P. v. CIBC World Markets Corp., supra*, 157 Cal.App.4th at p. 866.) In examining the record for substantial evidence, we neither reweigh the evidence (*In re Spencer W.* (1996) 48 Cal.App.4th 1647, 1650 [56 Cal.Rptr.2d 524]) nor substitute our own judgment for that of the jury if the evidence supports conflicting inferences (*Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 873–874 [197 Cal.Rptr. 925]). Here, Little testified that he expected his long and profitable relationship with the Martini parties to continue after the action involving Amber ended. Martini testified that he had routinely employed Little to provide legal services for 10 or 11 years prior to the action involving Amber. He further testified that after the settlement, he no longer hired Little and had no intention to retain Little in the future. When Amber's counsel asked why Martini had stopped engaging Little prior to the trial in the underlying action, Martini answered, "He sued me." Martini also stated that he had hired a new law firm to provide legal services and that he did not wish to disturb his relationship with it. This testimony is sufficient to show that it was Amber's misconduct regarding Little's retainer agreement that ended Little's profitable relationship with Martini.

Finally, Amber contends that Little offered only speculative and conjectural evidence regarding the amount of his lost profits. Generally, "[l]ost profits to an established business may be recovered if their extent and occurrence can be ascertained with reasonable certainty; once their existence has been so established, recovery will not be denied because the amount cannot be shown with mathematical precision." (*Berge v. International Harvester Co.* (1983) 142 Cal.App.3d 152, 161 [190 Cal.Rptr. 815].) In the case of an established business, lost profits may be shown by "the past volume of business and other provable data relevant to the probable future sales." (*Grupe v. Glick, supra*, 26 Cal.2d at p. 692.) As Little made a showing of this type regarding his established relationship with the Martini parties, there is sufficient evidence to support the award for lost profits. In sum, we see no error in the jury's determinations regarding Little's damages.

## DISPOSITION

The judgment is affirmed. Little is awarded his costs on appeal.

Willhite, Acting P. J., and Suzukawa, J., concurred.

A petition for a rehearing was denied January 9, 2012, and on January 17, 2012, the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied April 11, 2012, S199804.