Filed 9/23/16  Martinez v. Rite Aid Corp. CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| MARIA MARTINEZ,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>RITE AID CORPORATION et al.,<br><br>    Defendants and Respondents. | B263665<br><br>(Los Angeles County<br>Super. Ct. No. BC401746)<br><br>**ORDER MODIFYING OPINION**<br>(**NO  CHANGE IN JUDGMENT**) |

THE COURT:

    IT IS ORDERED that the opinion filed herein on September 1, 2016, and not certified for publication, be modified as follows:

1.  On page 23 at the end of the first sentence of the first full paragraph add footnote 5.  The following footnote thereafter shall be renumbered.

    It shall now read:

    Because this matter is to be tried for a third time on the issue of compensatory damages, we offer the following guidance to the trial court on retrial.**5**

**5.**    Appellant raised, and we reviewed, significant evidentiary and instructional claims which would require reversal.  Because of the errors we have identified affecting the verdict, our resolution of those issues is made unnecessary by the required remand.

    The foregoing does not affect a change in the judgment.  Respondent's petition for rehearing is denied.

_____

PERLUSS, P. J.,                    ZELON, J.,                    SEGAL, J.

Filed 9/1/16  Martinez v. Rite Aid Corp. CA2/7  (unmodified version)

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| MARIA MARTINEZ,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>RITE AID CORPORATION et al.,<br><br>    Defendants and Respondents. | B263665<br><br>(Los Angeles County<br>Super. Ct. No. BC401746) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mark V. Mooney, Judge.  Reversed and remanded with directions.

Shegerian & Associates, Carney R. Shegerian and Jill P. McDonell for Plaintiff and Appellant.

Kelly, Hockel & Klein, Jonathan Allan Klein, Thomas K. Hockel, and Mark P. Iezza for Defendants and Respondents.

_____

In 2008, appellant Maria Martinez filed this action against her former employer, respondent Rite Aid Corporation, and her former supervisor, respondent Kien Chau. In 2010, a jury returned a special verdict in favor of Martinez and awarded her a total of $3.4 million in compensatory damages. In a prior appeal filed by Rite Aid and Chau, we reversed the judgment in favor of Martinez, and remanded the matter for a new trial on compensatory damages as to Martinez's causes of action for wrongful termination in violation of public policy against Rite Aid and intentional infliction of emotional distress against Rite Aid and Chau. At a retrial in 2014, the jury awarded Martinez $321,000 on the wrongful termination claim, $0 on the intentional infliction of emotional distress claim against Rite Aid, and $20,000 on the intentional infliction of emotional distress claim against Chau. Martinez now appeals from the judgment entered following the retrial, and among other arguments, she asserts that the jury's special verdict is inconsistent as a matter of law. We agree that the jury's special verdict findings are fatally inconsistent, and accordingly, reverse the judgment on the special verdict and remand the matter for a new trial on the issue of compensatory damages.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### I.    The First Trial on Martinez's Claims Against Rite Aid and Chau

Martinez filed suit against Rite Aid and Chau in November 2008. Her complaint included causes of action for (1) wrongful termination in violation of public policy based on her disability, age, medical leave of absence, and complaint of sexual harassment, (2) intentional infliction of emotional distress, and (3) invasion of privacy. The case was originally tried to a jury over a four-week period starting in August 2010. The jury returned a special verdict in favor of Martinez, and awarded her $3.4 million in compensatory damages and $4.8 million in punitive damages.

On the wrongful termination claim, the jury found that Martinez had a known mental disability, took a medical leave of absence for a serious health condition, and made a complaint about sexual harassment. The jury further found that Martinez's disability, medical leave of absence, and sexual harassment complaint were a motivating

2

reason for Rite Aid's decision to discharge her and that the discharge caused Martinez harm.[1]  The jury awarded Martinez $1,116,666 on this claim, consisting of $20,000 in past economic loss, $150,000 in future economic loss, $813,333 in past non-economic loss, and $133,333 in future non-economic loss.

On the intentional infliction of emotional distress claims alleged against Rite Aid and Chau, the jury found that Rite Aid's employees and managers, including Chau, engaged in outrageous conduct toward Martinez between December 2006 and August 2007 while acting in the course and scope of their employment.  The jury also found that Rite Aid and Chau intended to cause Martinez emotional distress or acted in reckless disregard of whether she would suffer emotional distress, that Martinez suffered severe emotional distress, and that such conduct was a substantial factor in causing Martinez severe emotional distress.  The jury awarded Martinez $1,116,666 against Rite Aid on this claim, consisting of $20,000 in past economic loss, $150,000 in future economic loss, $813,333 in past non-economic loss, and $133,333 in future non-economic loss.  The jury also awarded $50,000 against Chau on this claim, consisting of $12,500 on each category of past and future economic loss and past and future non-economic loss.

On the invasion of privacy claim, the jury found that a Rite Aid employee publicized private information about Martinez's mental disability, and that such conduct was a substantial factor in causing her harm.  The jury awarded Martinez $1,116,668 on this claim, consisting of $20,000 in past economic loss, $150,000 in future economic loss, $813,334 in past non-economic loss, and $133,334 in future non-economic loss.

## II.    The Appeal from the Judgment in the First Trial

Rite Aid and Chau appealed from the judgment entered in favor of Martinez in the first trial.  Among other arguments, Rite Aid and Chau challenged the sufficiency of the evidence supporting the jury's special verdicts as to both liability and damages, and

---

[1]    The jury rejected Martinez's claim that her age was a motivating reason for Rite Aid's discharge decision.

contended that the compensatory damages awards were duplicative and ambiguous. This court concluded[2] that the evidence was sufficient to support the verdicts in favor of Martinez on her causes of action for wrongful termination in violation of public policy and intentional infliction of emotional distress, but not on her cause of action for invasion of privacy. We further concluded that the verdicts awarding compensatory damages to Martinez were impermissibly ambiguous, and that the verdict awarding punitive damages to Martinez was not supported by sufficient evidence to impose employer liability for punitive damages against Rite Aid. We therefore reversed the judgment in favor of Martinez and remanded the matter for a new trial on the issue of compensatory damages as to the causes of action for wrongful termination in violation of public policy and intentional infliction of emotional distress.

## III.    The Second Trial on the Issue of Compensatory Damages

The case was retried to a jury on the issue of compensatory damages in November 2014. The following is a summary of the evidence presented to the jury at the retrial.

### A.    Martinez's Testimony About Her Employment At Rite Aid

Martinez began her employment with Rite Aid, a large retail drugstore chain, in 1983 at the age of 17. After starting as an ice cream scooper, Martinez was promoted to a pharmacy clerk and later became a licensed pharmacy technician. In her first 20 years of employment at Rite Aid, Martinez was named "Employee of the Month" approximately 20 times and "Employee of the Year" two times in recognition of her superior customer service. During that time, Martinez got along well with her supervisors and did not receive any disciplinary actions regarding her work performance. Martinez loved her job at Rite Aid and considered it to be a lifelong career.

---

[2]    *Martinez v. Rite Aid Corporation* (Apr. 23, 2013, B228621) [nonpub. opn.].

4

As a pharmacy technician, Martinez was responsible for inputting the information in a customer's prescription into Rite Aid's computer system and then preparing a prescription label. After printing the label, Martinez would pull the medication from the shelf and place the medication, prescription, and label in a tray for the pharmacist to review. Martinez's job duties also included contacting physicians to verify prescriptions, assisting customers in dropping off and picking up prescriptions, operating the cash register at the pharmacy counter, and keeping the pharmacy area clean. Prior to January 2007, Martinez had never been accused of making prescription labeling errors at any time in her employment with Rite Aid.

In 2004, while Martinez was at work, an incident caused her to have an emotional reaction, and she had to be transported by ambulance from the store to the hospital. Martinez thereafter took a medical leave of absence and received treatment from a psychiatrist and psychologist over the next few months. Prior to that time, Martinez had not suffered from depression, anxiety, or other psychological condition, and had not sought treatment from a mental health professional. After returning to work at Rite Aid, Martinez was transferred to four different stores in a period of two and a half years. She had not been subject to such frequent transfers at any time prior to her leave of absence.

As of late 2006, Martinez was assigned to Rite Aid's Arcadia store where her direct supervisor was Chau, the pharmacist-in-charge. On the first day that Martinez worked with Chau, he falsely accused her of giving a medication to a customer for free, and Martinez had to contact the customer for the receipt to disprove the accusation. In December 2006, Chau began making derogatory remarks about Martinez's mental health. Although Martinez had not disclosed anything about her medical condition to Chau, he would tell her in a mocking voice to "go see [her] psychiatrist." On multiple occasions, Chau called Martinez "crazy," "bipolar," "psycho," and "mentally off" in the presence of her coworkers and customers. Chau also made comments about Martinez's age, telling her that she was "too old" and "getting over the hill." Chau's comments made Martinez feel uneasy and uncomfortable in the workplace.

5

On December 8, 2006, prior to opening the pharmacy, Martinez asked Chau if she could have Tylenol for a headache. Although Chau instructed Martinez to get the Tylenol herself, Martinez was not comfortable taking any medication at work that was not dispensed directly by the pharmacist. When Martinez handed the bottle of Tylenol to Chau, he slammed it on the counter and said, "Get it yourself." A customer standing on the other side of the closed pharmacy window overheard the argument and later made a comment about it. During the incident, Martinez was not discourteous to the customer or to Chau. However, on December 15, 2006, Chau issued a written warning to Martinez for allegedly being discourteous to both customers and fellow employees. Chau also changed Martinez's work schedule to the late shift without justification. After receiving the December 2006 warning, Martinez filed two grievances with her union in which she alleged that she was being discriminated against and harassed by Chau.

On January 23, 2007, Frank Granillo, a human resources manager at Rite Aid, issued two additional written warnings to Martinez based on information provided by Chau. The first warning stated that Martinez made an inappropriate sexual comment about a coworker in the presence of a customer and other store employees and that such conduct violated Rite Aid's anti-harassment policy. The second warning stated Martinez frequently made prescription labeling errors, failed to alert other staff members about outstanding prescription issues at the end of her shift, and openly criticized her coworkers and complained about the working conditions at Rite Aid. Martinez had not committed any of the misconduct set forth in these warnings and felt that she was being "persecuted" by Rite Aid and Chau.

Shortly after receiving the January 2007 warnings, Martinez learned that Chau previously had approached four of Martinez's coworkers and asked them to make false statements about Martinez as part of a plan to get her fired. In February 2007, following an investigation into the matter, Rite Aid found that Chau had violated the company's code of ethics policy by soliciting employees to lie about Martinez. Chau was suspended for nine days, demoted to the position of staff pharmacist with a reduction in pay, and issued a final written warning. Chau was also transferred to a different Rite Aid store and

6

thereafter had no further contact with Martinez. Rite Aid later withdrew the January 2007 written warnings that had been issued to Martinez, but did not inform her of the reason for its decision.

Following Chau's transfer, Chen Chen Hwang temporarily filled in as a pharmacist at the Arcadia store. Hwang made a point of telling Martinez that "no one liked [her]." In February 2007, at the request of a customer, Martinez asked Hwang if a prescribed medication had a generic equivalent that could be provided at a lower cost. Although Hwang approved the customer's request, she later complained to management that Martinez had acted outside the scope of her duties by changing a prescription without authorization from the pharmacist or physician. On March 14, 2007, Martinez was issued a written warning based on the incident reported by Hwang. Martinez then filed another grievance with her union in which she alleged that the March 2007 warning was unjust. At that point, Martinez was feeling angry, confused, and "emotionally assaulted" by the conduct of her supervisors.

As of March 2007, Bradley Lohman was the district manager for the Arcadia store. On a prior occasion, Lohman had encountered Martinez at a bank and touched her in a manner that made her uncomfortable. During a visit to the Arcadia store in March 2007, Lohman asked Martinez if she was the "same girl" that he had seen at the bank. When Martinez confirmed that she was, Lohman told her in a threatening voice that he knew she was a problem and he was going to take care of her.

In late March 2007, Martinez went to the Equal Employment Opportunity Commission (EEOC) to complain about her treatment at Rite Aid. Martinez decided to contact the EEOC at that time because she felt that she was being "targeted" by her supervisors and then abandoned by Rite Aid when she reported the mistreatment. Martinez continued performing her job duties at Rite Aid on a full-time basis, but she was increasingly tense, distrustful of others, and emotionally distraught. During this time, Martinez sought treatment for depression and anxiety from both a psychiatrist and a psychologist. As part of her treatment, Martinez was prescribed psychotropic medication and began attending weekly psychotherapy sessions.

7

In March 2007, Angelene Chan became the pharmacy manager for the Arcadia store. When Martinez needed to take time off from work for an appointment with her psychiatrist or psychologist, she would notify Chan and provide her with a medical note. Chan initially allowed Martinez to attend her scheduled appointments. On May 14, 2007, however, Chan sent an email to district management in which she falsely accused Martinez of failing to follow instructions and taking two-hour breaks without approval. Chan also began making derogatory comments about Martinez's mental health. When Martinez would tell Chan about a scheduled appointment, Chan would ask Martinez if she was going to see her psychiatrist. Chan also called Martinez a "basket case" and asked her if she was "crazy," "mentally off," and "unbalanced." The comments caused Martinez to feel anxious, upset, and "like [her] nerves were shattered." During a May 22, 2007 meeting with Granillo and district management, Martinez denied that she was engaging in any of the conduct alleged by Chan and explained that she needed time off from work to attend medical appointments. She also reported the derogatory remarks that Chan had made about her mental health. Although Granillo indicated that he would investigate the matter, he never followed up with Martinez about her complaints.

On May 11, 2007, Martinez filed an administrative charge with the EEOC in which she alleged that she was being subjected to unlawful discrimination and retaliation at Rite Aid. In her EEOC charge, Martinez specifically complained about Lohman's act of inappropriate touching and his subsequent threat of retaliation. She also complained about the March 2007 written warning that she had received for allegedly changing a customer's medication without approval. Rite Aid was given notice of Martinez's EEOC charge shortly after she filed it.

On July 3, 2007, Granillo issued Martinez a final written warning. The warning falsely stated that Martinez continued to make prescription labeling errors, repeatedly ignored or responded negatively to her supervisor's directions, disrupted service levels by refusing to cashier when necessary, and openly complained about her coworkers' performance. Upon receiving the warning, Martinez was distraught and felt like she was "ready to have another nervous breakdown." On July 27, 2007, Martinez sent a letter to

8

Rite Aid's chief executive officer in which she detailed the workplace discrimination and harassment she had experienced over the past year. Four days later, on July 31, 2007, Granillo placed Martinez on suspension.

On August 16, 2007, Martinez was notified in writing that her employment with Rite Aid had been terminated. When she received the termination notice, Martinez was devastated and felt "like something had died" within her. At the time of her termination, Martinez had been employed by Rite Aid for over 23 years.

Following her termination from Rite Aid, Martinez was unable to find another position as a pharmacy technician. Although she inquired with a number of pharmacies about potential job openings, she did not receive any offers of employment. In December 2007, Martinez was hired to perform clerical work for a medical billing office. That position paid a higher salary than Martinez had earned at Rite Aid and included health benefits; however, her employment ended after about a year when the business closed. In May 2011, Martinez obtained employment selling funeral and cemetery services at a mortuary, but she was later terminated from that position for failing to meet her sales goals. Shortly thereafter, Martinez was hired by another mortuary to perform a similar sales position. She received health benefits in that position, and initially was paid a base salary plus commissions from her sales. In May 2014, however, the mortuary changed the compensation structure for its sales positions to one based solely on commissions. In June 2014, Martinez took a leave of absence from her position at the mortuary, and she remained on leave at the time of the retrial in November 2014.

## B. Testimony of Martinez's Family and Former Coworkers

Martinez's husband and children testified about the nature and extent of her emotional distress. According to these family members, before Martinez began having difficulties at Rite Aid, she was a very loving wife and mother. She was talkative and outgoing, was actively involved in her children's extracurricular activities, and enjoyed spending time with her family. In the nine months preceding her termination, however, Martinez became increasingly anxious, depressed, and withdrawn. She cried frequently,

9

was distant and sad, and struggled to communicate with her husband and children. After her termination, Martinez became a different person. She was often angry, short-tempered, and paranoid. She lacked any interest in spending time with her family and instead wanted to be left alone. Since the termination, Martinez and her husband have had difficulty paying their mortgage, and they are in a constant state of concern about the possibility of losing their home.

Two of Martinez's former coworkers testified about the changes that they saw in her emotional state during her employment at Rite Aid. Melonnie Atianzar was a fellow pharmacist technician at the Arcadia store. Atianzar testified that, prior to December 2006, Martinez was happy, cheerful, and had a positive attitude. She got along well with her coworkers and enjoyed interacting with the customers. At some point, Atianzar told Martinez that Chau had asked her and other employees to write false statements about Martinez in order to get her fired. Martinez was distraught when she learned of Chau's plan and began to cry. Following Atianzar's disclosure, Martinez's demeanor changed. Atianzar observed that Martinez "was trying very hard to keep it together," but she appeared to be under a lot of pressure and often cried at work.

Olga DelAngel was the front-end manager for the Arcadia store during the time that Martinez worked there. DelAngel testified that Martinez loved her work at Rite Aid. She was emotionally invested in her job and needed it to financially support her family. Martinez was always respectful of the customers and supportive of her coworkers. At some point, DelAngel became aware that the pharmacists at the store were mocking Martinez, making demeaning comments about her, and "targeting" her for firing. DelAngel spoke with Martinez a few times after she was fired and saw that Martinez was devastated by her discharge. She was crying uncontrollably and was worried that she would not be able to pay her mortgage or provide for her children.

### C.  Testimony of Martinez's Medical Providers and Experts

Dr. Boghosian was Martinez's treating psychologist between March and December 2007. He previously had treated Martinez for symptoms of depression and

anxiety in 2004, when Martinez participated in a group psychotherapy clinic for persons disabled by job stress. In March 2007, Martinez presented with symptoms of anxiety and depression, and specifically complained that she was being subjected to harassment and retaliation at work. Her symptoms included feelings of unhappiness and worry, increased sleep, decreased concentration, fatigue, and social withdrawal. Martinez began attending individual and group therapy sessions with Dr. Boghosian. In May 2007, Dr. Boghosian diagnosed Martinez as suffering from adjustment disorder with anxious and depressed mood, and referred her to a psychiatrist for a medication evaluation. As of her last session with Dr. Boghosian in December 2007, Martinez continued to experience symptoms of anxiety and depression and to struggle with the emotional impact of losing her job. During the course of Martinez's treatment, Dr. Boghosian never placed any restrictions on her ability to work.

Dr. Phoebe Cervantes, a licensed psychologist, treated Martinez on two occasions in late 2013. Due to the limited time spent with Martinez, Dr. Cervantes was only able to formulate preliminary impressions about Martinez's condition. Dr. Cervantes testified that her "working diagnosis" was that Martinez was suffering from major depression and an anxiety disorder. Martinez reported to Dr. Cervantes that her symptoms included significant sadness, increased insecurity, frequent tearfulness, decrease in sleeping, weight gain, fatigue, low energy, and decrease in self-care. During her two sessions with Dr. Cervantes, Martinez discussed the emotional stress that she was experiencing due to financial concerns and the prior loss of her job at Rite Aid. Martinez also reported stress from her current job working at a mortuary, and noted that she was not sure the position was a good fit for her. In treating a patient suffering from depression, Dr. Cervantes generally would recommend both cognitive behavior therapy and medication, and if the treatment were effective, she would expect to observe an improvement in the patient's symptoms within three months.

Dr. Warren Procci, a psychiatrist, was retained by Martinez's counsel to conduct a forensic evaluation of Martinez in 2013 and 2014. As part of his evaluation, Dr. Procci reviewed Martinez's medical records regarding her mental health treatment, as well as

11

the reports prepared by the medical experts previously retained by the parties in this case. According to Dr. Procci, the various medical professionals who treated Martinez between December 2006 and August 2007 diagnosed her with major depressive disorder, a serious form of depression. The experts who evaluated Martinez in 2010, including a defense expert, similarly diagnosed her with major depressive disorder, and the plaintiff's expert determined that Martinez also suffered from generalized anxiety disorder. According to the medical records, Martinez had a prior "significant psychological mental health disruption" in 2004, which could have made her more susceptible to a depressive disorder in the event she experienced another serious stressful period.

Based on his evaluation of Martinez, Dr. Procci concluded that she suffered from major depressive disorder around the time of her termination from Rite Aid in 2007 and continuing through 2014. Martinez also suffered from generalized anxiety disorder and had symptoms associated with post-traumatic stress disorder. During the evaluation, Martinez described experiencing a very difficult work environment in the nine months preceding her termination, including unwarranted disciplinary actions and derogatory comments about her mental health. Martinez also reported that, between December 2006 and August 2007, she was suffering from a depressed mood, sleep and appetite problems, difficulty experiencing pleasure, loss of self-confidence, and apprehension about her future. Martinez's termination in August 2007 exacerbated her symptoms of depression and anxiety, in part, because her sense of identity was closely tied to her job at Rite Aid. In 2008, Martinez experienced a period of partial remission in which she had minimal anxiety and no depressed mood while receiving mental health treatment. Dr. Procci believed that Martinez could benefit from a vigorous course of treatment with both a psychiatrist and a psychologist, and estimated that the cost of such treatment would be between $15,000 and $20,000. Dr. Procci further concluded, however, that Martinez was suffering from a persistent form of major depressive disorder, which made the potential for recovery from her condition less likely.

### D. Testimony of Martinez's Economic Expert

Dr. Tamorah Hunt, a forensic economist, was retained by Martinez's counsel to conduct an evaluation of Martinez's economic damages for the retrial in 2014. At the time of her termination from Rite Aid, Martinez's average past annual income was $33,581. Dr. Hunt calculated Martinez's past economic loss based on her lost earnings and lost health benefits from the termination of her employment in August 2007 to the estimated date of the retrial in August 2014. Dr. Hunt calculated Martinez's future economic loss based on her projected lost earnings and lost health and retirement benefits to the estimated date of Martinez's retirement in 2028 at the age of 63. Based on Dr. Hunt's calculations, Martinez's total past economic loss was $319,102, and her total future economic loss was $674,334.[3] In addition to these figures, Dr. Hunt determined that the amount Martinez would owe in taxes if she were awarded the economic damages sought was $884,445. Based on Dr. Hunt's calculations, Martinez's total economic damages, including her tax liability on a damages award, was $1,877,881.

### E. Testimony of Martinez's Current Employer

The only witness that Rite Aid called to testify at the retrial was Mae Settle, Martinez's direct supervisor for her current position at the mortuary. According to Settle, Martinez was hired as a family service counselor in April 2013. The primary job duty of the position is to solicit patrons for preplanning funeral, burial, or cremation services.

---

[3] Dr. Hunt also served as Martinez's economic expert at the first trial in 2010. At that time, Dr. Hunt calculated Martinez's past economic loss from her termination of employment to the start of the 2010 trial, and calculated her future economic loss for three alternative time periods assuming that Martinez remained unemployed for each period. According to Dr. Hunt's 2010 calculations, Martinez's past economic loss was $57,489, and her future economic loss was $155,560 as of 2013, $258,825 as of 2015, and $366,671 as of 2017. In calculating Martinez's economic loss for the 2010 trial, Dr. Hunt included an offset for the income that Martinez earned in other jobs following her discharge from Rite Aid. Dr. Hunt did not, however, include an offset for Martinez's post-Rite Aid earnings or benefits when she made these calculations for the 2014 retrial. According to Dr. Hunt, she was instructed by plaintiff's counsel not to make such an adjustment in her 2014 calculations due to a recent change in the law regarding offsets.

13

Over 40 percent of the employees in Martinez's position earn more than $34,000 per year, and the company offers its employees a generous benefits package. During her first year of employment at the mortuary, Martinez earned about $36,000, which included $19,000 in base pay; however, her sales performance declined after the company changed to a commission-only pay structure. Settle described Martinez's overall job performance as "good." She also testified that Martinez "perfectly fit the role" of a family service counselor and was compassionate, tactful, and well-liked by the families that she served. Settle never perceived Martinez to be emotionally unstable or unusually sad or depressed. Instead, Martinez exhibited a positive energy level, got along well with her coworkers, and was focused and productive in her work. At the time of the retrial, Martinez was on a personal leave of absence from her position, which remained available to her when she was ready to return to work.

### F. The Jury's Special Verdict

On December 4, 2014, the jury returned a special verdict on Martinez's claims for compensatory damages. On the cause of action for wrongful termination in violation of public policy against Rite Aid, the jury found that Rite Aid's wrongful termination in August 2007 was a substantial factor in causing Martinez harm and awarded Martinez a total of $321,000 in damages on this claim, consisting of $126,000 in past economic loss, $40,000 in future economic loss, $77,500 in past non-economic loss, and $77,500 in future non-economic loss. On the cause of action for intentional infliction of emotional distress against Rite Aid, the jury found that Rite Aid's intentional infliction of emotional distress toward Martinez between December 2006 and August 2007 was a substantial factor in causing her harm, but awarded Martinez $0 in damages on this claim. On the cause of action for intentional infliction of emotional distress against Chau, the jury found that Chau's intentional infliction of emotional distress toward Martinez between December 2006 and February 2007 was a substantial factor in causing her harm, and awarded Martinez $20,000 in past non-economic loss and $0 in future non-economic loss on this claim.

14

**DISCUSSION**

Martinez raises the following arguments on appeal: (1) the jury's special verdict findings on non-economic damages are inconsistent; (2) the jury committed prejudicial misconduct during the presentation of evidence and deliberations; (3) the trial court abused its discretion in excluding evidence of tortious conduct by Rite Aid that supported Martinez's claim for non-economic damages; and (4) the trial court erred in failing to give Martinez's proposed jury instructions on preexisting conditions and unusual susceptibility to injury. For the reasons set forth below, we conclude that the judgment must be reversed and the matter remanded for a new trial on compensatory damages because the jury's special verdict findings are fatally inconsistent.

**I.      Governing Legal Principles on Inconsistent Verdicts**

"'Inconsistent verdicts are '"against the law"'" and are grounds for a new trial. [Citation.]" (*City of San Diego v. D.R. Horton San Diego Holding Co., Inc.* (2005) 126 Cal.App.4th 668, 682.) "A special verdict is inconsistent if there is no possibility of reconciling its findings with each other. [Citation.] If a verdict appears inconsistent, a party adversely affected should request clarification, and the court should send the jury out again to resolve the inconsistency. [Citations.] If no party requests clarification or an inconsistency remains after the jury returns, the trial court must interpret the verdict in light of the jury instructions and the evidence and attempt to resolve any inconsistency. [Citations.]" (*Singh v. Southland Stone, U.S.A., Inc.* (2010) 186 Cal.App.4th 338, 357-358, fn. omitted.) If a verdict "is 'merely ambiguous,' a party's failure to seek clarification of the verdict before the jury is discharged may work a forfeiture of the purported defect on appeal, 'particularly if the party's failure to object was to reap a "'technical advantage'" or to engage in a "'litigious strategy.'"' [Citation.]" (*Little v. Amber Hotel Co.* (2011) 202 Cal.App.4th 280, 299.) In contrast, if the verdict is ""'"hopelessly ambiguous"'" or inconsistent, failure to seek clarification from the jury does not create a forfeiture. . . . [Citation.]" (*Id.* at p. 300.) Thus, where a jury's special

15

verdict findings are inconsistent, no objection is required in the trial court to preserve the issue for review on appeal. (*Behr v. Redmond* (2011) 193 Cal.App.4th 517, 530.)

An appellate court reviews a special verdict de novo to determine whether its findings are inconsistent. (*Zagami, Inc. v. James A. Crone, Inc.* (2008) 160 Cal.App.4th 1083, 1092.) "A court reviewing a special verdict does not infer findings in favor of the prevailing party [citation], and there is no presumption in favor of upholding a special verdict when the inconsistency is between two questions in a special verdict. [Citation.] 'Where there is an inconsistency between or among answers within a special verdict, both or all the questions are equally against the law.' [Citations.]" (*Ibid.*) "'The appellate court is not permitted to choose between inconsistent answers. [Citations.]' [Citation.] The proper remedy for an inconsistent special verdict is a new trial. [Citation.]" (*Singh v. Southland Stone, U.S.A., Inc.*, *supra*, 186 Cal.App.4th at p. 358.)

## II.    The Jury's Findings on Martinez's Non-Economic Damages Are Inconsistent

Martinez contends that she is entitled to new trial on the issue of compensatory damages because the jury's special verdict findings on non-economic damages are inconsistent as a matter of law. Martinez specifically asserts that the jury's finding that she suffered $0 in non-economic damages with respect to her intentional infliction of emotional distress claim against Rite Aid is inconsistent with the finding that Rite Aid's tortious conduct toward Martinez caused her harm. Martinez also argues that the jury's award of $0 on the intentional infliction of emotional distress claim against Rite Aid is inconsistent with its award of $20,000 on the intentional infliction of emotional distress claim against Chau. Rite Aid and Chau, however, maintain that there is no inconsistency in the verdict because the jury awarded $155,000 in non-economic damages against Rite Aid on the wrongful termination in violation of public policy claim, and such award compensated Martinez for both the emotional distress caused by the termination and the emotional distress caused by Rite Aid's pre-termination conduct.

16

## A. Intentional Infliction of Emotional Distress Against Rite Aid

Based on our review of the special verdict, the jury instructions, and the evidence presented at trial, we conclude that the jury's special verdict findings on Martinez's non-economic damages are fatally inconsistent. First, the jury's award of $0 in non-economic damages on the intentional infliction of emotional distress against Rite Aid is inconsistent with the prior special verdict establishing Rite Aid's liability to Martinez for intentional infliction of emotional distress, which necessarily included causation of damages. To prevail on a cause of action for intentional infliction of emotional distress, the plaintiff must prove "'"'(1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct.'"'" (*Potter v. Firestone Tire & Rubber Co.* (1993) 6 Cal.4th 965, 1001.) At the first trial in 2010, the jury returned a special verdict in favor of Martinez on her intentional infliction of emotional distress claim against Rite Aid. The 2010 jury specifically found that (1) Rite Aid employees or managers engaged in outrageous conduct toward Martinez between December 2006 and August 2007; (2) the Rite Aid employees or managers who engaged in the outrageous conduct toward Martinez were acting within the course and scope of their employment; (3) Rite Aid intended to cause Martinez emotional distress and/or acted with reckless disregard of the possibility that Martinez would suffer emotional distress; (4) Martinez suffered severe emotional distress; and (5) Rite Aid's conduct was a substantial factor in causing Martinez's severe emotional distress. At the retrial on compensatory damages in 2014, at which Martinez testified to the nature of her distress, the jury was bound by these prior liability findings. Thus, while the extent of damages suffered by Martinez was a matter for the 2014 jury to decide, its finding that Martinez did not suffer any emotional distress damages from Rite Aid's outrageous conduct is inconsistent with the prior finding that such conduct caused Martinez to suffer severe emotional distress.

17

In their respondents' brief, Rite Aid and Chau do not dispute that, based on the 2010 jury's special verdict, Rite Aid's conduct toward Martinez between December 2006 and her termination of employment in August 2007 caused Martinez to suffer emotional distress. Instead, Rite Aid and Chau assert that "[t]he simple explanation for the jury's entry of zero . . . emotional distress damages on the [intentional infliction of emotional distress] claim against Rite Aid is that the jury *already compensated Martinez for emotional distress caused by Rite Aid* under the wrongful termination claim, and the special verdict form specifically directed the jury not to duplicate damages." In other words, Rite Aid and Chau contend that the jury must have intended for its award of non-economic damages on the wrongful termination claim to compensate Martinez for both the emotional distress caused by Rite Aid's wrongful termination and the emotional distress caused by Rite Aid's other tortious conduct toward Martinez in the nine months preceding her termination. This interpretation of the jury's special verdict, however, is inconsistent with the law and the evidence at trial.

The elements of a cause of action for wrongful termination in violation of public policy are that (1) the plaintiff was employed by the defendant; (2) the plaintiff's employment was terminated; (3) a violation of public policy was a motivating reason for the termination; and (4) the termination caused the plaintiff harm. (*Haney v. Aramark Uniform Services, Inc.* (2004) 121 Cal.App.4th 623, 641.) As our Supreme Court has observed, "[t]he central assertion of a claim of wrongful termination in violation of public policy is that the employer's motives for terminating the employee are so contrary to fundamental norms that the termination inflicted an injury sounding in tort. [Citation.]" (*Roby v. McKesson Corp.* (2009) 47 Cal.4th 686, 702.) Hence, a "wrongful termination claim necessarily focuse[s] exclusively on the termination itself," and seeks to compensate the plaintiff for the harm caused by the termination. (*Ibid*.) This court recognized that legal principle in our prior opinion in this case. In reviewing the compensatory damages awarded in the first trial, we explained that Martinez's wrongful termination claim focused exclusively on the termination itself, and thus, the non-economic damages awarded by the jury on that claim solely compensated Martinez for

18

the emotional distress caused by the termination. Martinez's claim for intentional infliction of emotional distress against Rite Aid was broader in scope, encompassing both the termination and the discriminatory and harassing conduct by Rite Aid that preceded the termination. Accordingly, while the two claims overlapped with respect to the non-economic damages caused by the termination, only the intentional infliction of emotional distress claim also sought non-economic damages for Rite Aid's discriminatory and harassing conduct toward Martinez in the nine months preceding the termination.

Additionally, the evidence presented at the retrial established that Martinez suffered emotional distress damages from the outrageous conduct of Rite Aid employees between December 2006 and her termination in August 2007. In particular, the evidence showed that, over the course of this nine-month period, multiple supervisors at Rite Aid made derogatory remarks about Martinez's mental health, repeatedly calling her "crazy," "bipolar," "psycho," "mentally off," and "unbalanced," and telling her to "go see [her] psychiatrist." These supervisors also falsely accused Martinez of poor performance and unprofessional conduct to Rite Aid's district-level management, and Chau even solicited his subordinates to provide false statements about Martinez as part of a concerted effort to get her fired. The evidence further showed that Martinez was emotionally distressed during this time period because of her supervisors' discriminatory and harassing conduct. In the five months preceding her termination, Martinez sought treatment for depression and anxiety due to work-related stress, and she continued to receive mental health treatment on a regular basis through the termination of her employment.

Moreover, during closing arguments, Martinez's counsel made clear that the intentional infliction of emotional distress claim sought damages for the harm caused by Rite Aid's *pre-termination* conduct, and explained to the jury that the claim "covers the pre-termination time period from approximately December of 2006 through termination in . . . August of 2007." Defense counsel likewise acknowledged that the time period at issue for the intentional infliction of emotional distress claim was between December 2006 and August 2007. Defense counsel also noted that Rite Aid was not disputing that Martinez suffered some emotional distress during this period based on her supervisors'

19

conduct, and that the question for the jury was "how much she was harmed and what's that worth." Given that the intentional infliction of emotional distress claim against Rite Aid was broader in scope than the wrongful termination claim and covered a time period where Martinez indisputably suffered emotional distress from Rite Aid's conduct, the jury's award of $155,000 in non-economic damages on the wrongful termination claim was inconsistent with its award of $0 on the intentional infliction of emotional distress claim. (See *Roby v. McKesson Corp., supra,* 47 Cal.4th at pp. 703-704 [non-economic damages award of $500,000 on wrongful termination claim was inconsistent with non-economic damages award of $300,000 on discrimination claim where discrimination claim "was, as a legal matter, the broader of the two claims [and] covered both the termination itself and events that preceded the termination"].)

## B. Intentional Infliction of Emotional Distress Against Chau

The jury's award of $0 in non-economic damages on the intentional infliction of emotional distress claim against Rite Aid also appears to be inconsistent with its award of $20,000 in non-economic damages on the intentional infliction of emotional distress claim against Chau. In denying Martinez's motion for a new trial, the trial court found no inconsistency in the special verdict because the jury "may well have thought the conduct of Mr. [Chau] . . . was outside [the] course and scope" of his employment and "Rite Aid shouldn't be responsible for that." However, any such finding by the 2014 jury would have been contrary to the prior finding made by the 2010 jury regarding Rite Aid's vicarious liability for Chau's conduct. On the intentional infliction of emotional distress claim against Chau, the 2010 jury specifically found that Chau was acting within the course and scope of his employment at Rite Aid when he engaged in outrageous conduct toward Martinez between December 2006 and February 2007. Although the 2014 jury was instructed on the basic principle of vicarious liability with CACI No. 3700,[4] it was

---

[4] CACI 3700, as given to the jury, states that "[a] corporation is responsible for harm caused by the wrongful conduct of its employees while acting within the scope of their employment."

not instructed that Chau previously was found to have been acting within the course and scope of his employment in his wrongful conduct, and that such finding was binding upon the jury for the purpose of determining damages.

Furthermore, the discrepancy between the jury's special verdicts on the intentional infliction of emotional distress claims against Rite Aid and Chau was not supported by the evidence presented at the retrial. The undisputed evidence showed that the emotional distress that Martinez suffered in the nine months preceding her termination was not caused solely by Chau, but also by other Rite Aid employees who were acting within the course and scope of their employment. After Chau was transferred in February 2007, Martinez's two new supervisors, Hwang and Chan, falsely accused Martinez of poor performance and workplace misconduct in an effort to get her fired, and Chan repeatedly made derogatory remarks about Martinez's mental health. During this same period, another Rite Aid manager, Lohman, threatened to retaliate against Martinez following an incident where he touched her in a manner that made her uncomfortable. While Rite Aid challenged the amount of emotional distress damages sought by Martinez at the retrial, it did not dispute that Rite Aid employees other than Chau caused Martinez to suffer emotional distress. Therefore, on this record, any award of non-economic damages based on Rite Aid's vicarious liability for intentional infliction of emotional distress should have exceeded the jury's award of non-economic damages against Chau.

## C. Martinez Has Not Forfeited Her Challenge

Rite Aid and Chau contend that, if there was any inconsistency in the jury's special verdict, Martinez forfeited her right to raise the issue on appeal. In particular, they assert that Martinez waived any objection to the special verdict rendered against Chau because her counsel previously had stipulated that any damages awarded against Chau would be subsumed in the damages awarded against Rite Aid for intentional infliction of emotional distress. Martinez's stipulation, however, simply reflected the established legal principle that Rite Aid's liability for intentional infliction of emotional distress was vicarious, and thus, Martinez would not be entitled to recover damages for

21

the same harm from both Rite Aid and Chau.  In other words, the stipulation meant that Martinez could not seek to recover $20,000 directly from Chau based on the jury's damages award against him, and then seek an additional $20,000 from Rite Aid based on its vicarious liability for Chau's conduct.  Martinez's stipulation that she was not entitled to duplicative damages on her intentional infliction of emotional distress claims did not waive her right to object to the inconsistent verdict rendered by the jury.

Rite Aid and Chau also assert that Martinez waived any objection to jury's special verdict because she failed to request clarification on the verdict prior to the jury's discharge.  It is well-established, however, that where, as here, a jury's special verdict findings are inconsistent, the failure to seek clarification before the jury is discharged does not create a forfeiture.  (*Little v. Amber Hotel Co., supra*, 202 Cal.App.4th at p. 300; *Behr v. Redmond*, *supra*, 193 Cal.App.4th at p. 530.)  Even where the special verdict findings are merely ambiguous, a party's failure to request a correction or clarification prior to the jury's discharge does not result in an automatic waiver of the issue on appeal.  For instance, "'[w]aiver is not found where the record indicates that the failure to object was not the result of a desire to reap a "technical advantage" or engage in a "litigious strategy." [Citations.]' [Citation.]" (*Behr v. Redmond*, *supra*, at p. 530.)  In this case, the record reflects that both the parties and the trial court were cognizant of the defects in the special verdict rendered by the jury in the first trial, and acted in good faith to craft a verdict form that addressed those deficiencies at the retrial.  It appears from the record that, after significant discussion with both counsel, the trial court approved the Martinez's proposed verdict forms with certain revisions.  Ultimately, however, the verdict forms that were submitted to the jury were not a model of clarity and the instructions given to the jury failed to adequately explain both the prior findings of liability and the proper method of apportioning damages between multiple causes of action and multiple defendants.  The jury then returned a special verdict with findings on non-economic damages that were fatally inconsistent.  For these reasons, the judgment entered on the special verdict must be reversed and the matter remanded for a new trial on compensatory

22

damages as to the causes of action for wrongful termination in violation of public policy and intentional infliction of emotional distress.

Because this matter is to be tried for a third time on the issue of compensatory damages, we offer the following guidance to the trial court on retrial. First, the jury should be instructed on the specific liability findings that were made in the first trial, and the fact that it is bound by each of those prior findings. On the wrongful termination claim, the trial court should instruct the jury that it is bound by the findings that (1) Martinez had a known mental disability, took a medical leave of absence for a serious health condition, and made a complaint about sexual harassment; (2) Martinez's mental disability, medical leave of absence, and sexual harassment complaint were a motivating reason for Rite Aid's decision to discharge her; and (3) the discharge caused Martinez harm. On the intentional infliction of emotional distress claims, the trial court should instruct the jury that it is bound by the findings that (1) Rite Aid employees and managers, including, but not limited to Chau, engaged in outrageous conduct toward Martinez between December 2006 and August 2007; (2) those Rite Aid employees and managers who engaged in the outrageous conduct toward Martinez were acting within the course and scope of their employment; (3) Rite Aid intended to cause Martinez emotional distress and/or acted with reckless disregard of the possibility that she would suffer emotional distress; (4) Martinez suffered severe emotional distress; and (5) the conduct of Rite Aid, its employees and Chau was a substantial factor in causing Martinez severe emotional distress. On the special verdict form, the jury should not be asked whether the termination or other tortious conduct was a substantial factor in causing Martinez harm because these liability questions were found to be true at the first trial and the jury is bound by those findings.

In addition to giving the standard instructions on non-economic damages, the trial court should instruct the jury that any non-economic damages awarded on the wrongful termination in violation of public policy claim are to compensate Martinez for the harm caused by the termination of her employment in August 2007. The trial court also should instruct the jury that any non-economic damages awarded on the intentional infliction

23

of emotional distress claims are to compensate Martinez for the harm caused by the outrageous conduct of Rite Aid employees, including Chau, that occurred between December 2006 and August 2007. To avoid the possibility of duplicative damages against Rite Aid on these claims, the jury should be instructed that any damages for the harm caused by Rite Aid's wrongful termination of Martinez should be awarded only once. To avoid the possibility of duplicative damages between Rite Aid and Chau on the intentional infliction of emotional distress claims, the special verdict form should ask the jury what amount or percentage of non-economic damages were caused by Chau, and what amount or percentage of non-economic damages were caused by other Rite Aid employees during the relevant time period.

In light of our conclusion that the judgment must be reversed and the matter remanded for a new trial on compensatory damages, we need not resolve the remaining issues raised by Martinez on appeal, including her argument that the trial court erred in excluding several categories of evidence that were relevant to non-economic damages. While we do not address the merits of Martinez's specific claims of evidentiary error, we note that evidence concerning how Martinez was treated by her supervisors and other employees of Rite Aid may be relevant to showing the extent of emotional distress that she suffered during the relevant time period, even if such evidence was also relevant to establishing liability on the underlying claims.[5] On retrial, Martinez must therefore be permitted to present sufficient evidence for the jury to assess the nature and degree of her claimed injuries and to determine the amount of compensatory damages to be awarded to Martinez based on the prior findings of liability.

---

[5] By way of example, the fact that Martinez took a medical leave of absence for a mental disability in 2004 due to work-related stress may be relevant to demonstrating that Martinez had a pre-existing condition which made her more susceptible to suffering a psychological injury between December 2006 and August 2007 due to Rite Aid's tortious conduct.

## DISPOSITION

The judgment is reversed.  The matter is remanded to the trial court for a new trial on the issue of compensatory damages as to the causes of action for wrongful termination in violation of public policy against Rite Aid and intentional infliction of emotional distress against Rite Aid and Chau.  Martinez shall recover her costs on appeal.


ZELON, J.


We concur:


PERLUSS, P. J.


SEGAL, J.